OPINION OF THE COURT
Lucindo Suarez, J.
The issue in this posttrial motion is whether the evidence was sufficient as a matter of law to support the jury’s finding that continued care and treatment in a psychiatric institution is not essential to petitioner’s welfare, although the jury found he is suffering from a mental illness. This court holds the evidence was insufficient as a matter of law to support the jury’s finding regarding continued care and treatment. The uncontradicted material facts support no other conclusion than that petitioner is in need of continued care and treatment in a psychiatric institution, because he is mentally ill, poses a danger to himself and others, and his judgment is so impaired that he is unable to understand the need for continued care.
One of the basic principles of trial by jury is that the Judge determines the applicable law and the jury determines the facts. In general, neither Judge nor jury may intrude upon the other’s province, except in certain limited circumstances. After a trial has taken place, any party, or the court on its own initiative, may make a motion to set aside a verdict and either enter judgment or order a new trial. A posttrial motion for judgment or new trial allows the court to "set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of evidence, [or] in the interest of justice”. (CPLR 4404 [a].)
Setting aside a verdict in the interest of justice is usually done for reasons such as errors in admissibility of evidence, mistakes in the charge, misconduct, newly discovered evidence and surprise, or change in the law after submission of the case to the jury. The Trial Judge must decide whether substantial justice has been done, which includes a determination as to whether it is likely the verdict has been affected. (Micallef v Miehle Co., 39 NY2d 376 [1976]; Matter of De Lano, 34 AD2d 1031 [3d Dept 1970].)
Setting aside a verdict because it is contrary to the weight of the evidence is done either because the evidence supports only one conclusion, the jury finding to the contrary, or because the evidence supports more than one conclusion but overwhelm *548 ingly favors the conclusion rejected by the jury. In the former, the court enters judgment in favor of the party entitled to judgment as a matter of law. In the latter, the court orders a new trial. To order a new trial because the verdict is contrary to the weight of the evidence requires the court to find that the jury’s verdict is not supported by any "fair interpretation of the evidence”. (Nicastro v Park, 113 AD2d 129 [2d Dept 1985]; Buscaglia v Olka, 101 AD2d 713 [4th Dept 1984].) Whether a particular factual determination is against the weight of the evidence is itself a factual question. It is based on the court’s conclusion that the trier of fact assessed the evidence incorrectly. (Cohen v Hallmark Cards, 45 NY2d 493 [1978].) This determination requires a discretionary balancing of many factors, including the deference due the jury’s role as finder of fact. (Nicastro v Park, supra.) Where the testimony is in conflict, credibility and weight are for the jury. (Niewieroski v National Cleaning Contrs., 126 AD2d 424 [1st Dept 1987], Iv denied 70 NY2d 602 [trial court usurped jury’s role in vacating jury verdict and ordering new trial in slip and fall case where evidence key to liability, whether caution signs were in place at time of accident, was in conflict]; Monaghan v Yang, 119 AD2d 813, Iv dismissed 69 NY2d 945, rearg denied 70 NY2d 694 [trial court did not err in denying motion to set aside verdict in light of conflicting evidence given by expert witnesses in medical malpractice action].) If there is any way reasonable men could have rendered the jury’s verdict after reviewing conflicting evidence, the trial court may not substitute its personal judgment. (Singer v Crupi, 83 AD2d 962 [2d Dept 1981].) However, the mere fact that some testimony has created a factual issue does not deprive the Trial Judge of the power to intervene in an appropriate case. It is the existence of a factual issue which justifies the granting of a new trial rather than a directed verdict. (Nicastro v Park, supra.)
Whether a jury verdict is contrary to the weight of the evidence is to be distinguished from the question of whether a jury verdict, as a matter of law, is not supported by sufficient evidence. This latter question is a legal determination as opposed to a factual one. To hold that a jury verdict, as a matter of law, is not supported by sufficient evidence, it is necessary to "conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial.” (Cohen v Hallmark Cards, 45 NY2d, at 499, supra.) This is a much more stringent standard than *549 that required for a new trial. It is applied in two situations: where the verdict is contrary to the weight of the evidence and there is no fact issue in dispute, or where the verdict is contrary to the weight of the evidence to the extent that any evidence in opposition is so meager as to be the equivalent of no evidence. (Westbrook v Green Bus Lines, 30 AD2d 959 [1st Dept 1968].) "When we say that there is no evidence to go to a jury, we do not mean that there is literally none, but that there is none that ought reasonably to satisfy a jury that the fact sought to be proved is established.” (Blum v Fresh Grown Preserve Corp., 292 NY 241, 246 [1944]; see also, Annunziata v Colasanti, 126 AD2d 75 [1st Dept 1987] [although trial court was justified in setting aside jury’s verdict as against weight of the evidence, court erred in not directing judgment in favor of plaintiff where plaintiff alleged defendant had not properly covered a large sewer trap and presented testimony and photographs to show the trap covered only by rotted plywood, and defendant gave incredible and contradictory assertions that he had covered trap with construction planks, or a kitchen tabletop, or both, and accepted photographs as accurate portrayal of trap on the day after the accident].)
To compel the continued retention of the petitioner in Bronx Psychiatric Center, the Director of that center had the burden of proof to show by clear and convincing evidence that the petitioner is mentally ill, that continued care and treatment as a patient in the hospital is essential to his welfare and that petitioner’s judgment is so impaired that he is unable to understand the need for continued care and treatment. (See, Matter of Seltzer v Hogue, 187 AD2d 230 [2d Dept 1993]; Matter of Harry M., 96 AD2d 201 [2d Dept 1983]; Matter of Scopes v Shah, 59 AD2d 203 [3d Dept 1977]; O’Connor v Donaldson, 422 US 563 [1975]; PJI 8:7.) Under an original order of retention, governed by Mental Hygiene Law § 9.33, in order for a hospital to retain a patient for involuntary psychiatric care, it must be established, by clear and convincing evidence, that the patient is mentally ill and in need of continued care and treatment, and that he poses a substantial threat of physical harm to himself or others. (Matter of Naila Y. v Sanchez, 215 AD2d 183 [1st Dept 1995]; Matter of Donaldson v Daley, 206 AD2d 298 [1st Dept 1994].) A person’s mental illness may manifest itself in neglect or refusal to care for himself to such an extent that there is presented serious harm to his own well-being. (Matter of Scopes v Shah, supra; Matter of Boggs v New York City Health & Hosps. Corp., 132 AD2d 340 [1st Dept 1987], appeal *550 dismissed 70 NY2d 972, 981, rearg denied 71 NY2d 994.) "Serious harm” to one’s own well-being is defined in Mental Hygiene Law § 9.39, governing emergency admissions for immediate observation, care, and treatment, as
"1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
"2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.”
Petitioner is a 41-year-old male patient at Bronx Psychiatric Center who has been hospitalized for approximately 32 years in various mental health institutions. As a child, he fell three stories to the ground, suffering injuries to his head. At age 9 or 10, with both parents deceased, he was sent from a foster home into a children’s home and thereafter transferred to Creed-moor Psychiatric Hospital. In 1992, when petitioner was discharged to live outside the hospital, he stopped taking his medications. When found standing in moving traffic, he was returned to the psychiatric facility. In October of 1994, petitioner left the hospital without permission, was not taking his medications and began using crack. He suffered a seizure and was taken to a hospital emergency room. He was voluntarily committed to Bronx Psychiatric Center, but later expressed a desire to leave. After a hearing pursuant to Mental Hygiene Law § 9.33, it was ordered that petitioner be retained for an additional six months. Petitioner exercised his right under Mental Hygiene Law § 9.35 to have a trial by jury to determine whether the order for retention should remain undisturbed. Evidence was presented and the jury was given a verdict sheet with the following questions:
(1) Is Calvin Robinson suffering from mental illness?
(2) Is continued care and treatment in a psychiatric institution essential to Calvin Robinson’s welfare?
(3) Is Calvin Robinson’s judgment so impaired that he is unable to understand the need for continued care and treatment?
The jury found petitioner to be mentally ill. However, it also found it was not essential to the petitioner’s welfare that he remain hospitalized. For that reason, the third question was not addressed.
Both psychiatrists testifying for the Director agreed petitioner suffered brain damage from his fall as a child which left *551 him with a seizure disorder. They said he suffered from poor impulse control as a result and wide fluctuations of behavior. They said he is easily frustrated by many things, such as not getting his coffee on time or not being unconditionally restored to a level of privilege which he forfeited earlier by unacceptable behavior.
The consulting psychiatrist, Dr. Bruce David, testified that petitioner had been in a number of different institutions because his behavior was "assaultive”, and when it did not improve at each institution, it was believed a different environment might make a difference in his behavior. Dr. David said the hospital records reflected incidents where petitioner had threatened other inmates and staff with angry words and gestures. On the first day of the trial, petitioner returned to the hospital and swung his arm at a "team leader”. The record also showed he had pushed a pregnant nurse after being given his medications. Dr. David said one record note showed petitioner had assaulted another patient over money, and still another for no reason.
Petitioner’s treating psychiatrist, Dr. Mohem Park, testified that the petitioner is sometimes dangerous to others, but that he is always a danger to himself mainly because of his poor impulse control and because he does not believe he needs his medications. When it appears he is becoming assaultive and threatening to others in the hospital, the situation is controlled by putting petitioner in "secure care”, which provides more staff, more supervision and "seclusion rooms”.
Both psychiatrists referred to two raised lumps, approximately the diameter of quarters, on petitioner’s face. The lumps are scarred, one on the bridge of petitioner’s nose and the other in the center of his forehead. The doctors testified that the lumps resulted from petitioner’s repeatedly banging his head and nose on the floor or walls when angry or frustrated, causing himself to bleed. When the wounds healed, petitioner would reinjure himself.
Dr. Park testified that the petitioner is given antiseizure medications, Tegretol and Depakote, Navane in injection form for behavior, and Cogentin to counteract the side effects of Na-vane. Petitioner objected to the Navane because he did not like the injections and therefore the hospital substituted another drug, Serentil, at his request. Occasionally, he is given a dose of Ativan when he becomes "agitated”.
Dr. Park testified that several levels of privileges are maintained by the hospital, the highest being level six. When a *552 patient’s behavior meets certain standards at one level, he is advanced to the next level. Level six allows patients to leave the hospital grounds to approved destinations. Petitioner has occasionally achieved level six, but remains at this level only for short periods. Under Dr. Park’s care, he has only achieved level four before his behavior has caused a loss of privileges.
The psychiatrists said that, although he is able to care for himself for short periods, they did not believe the petitioner would continue on his regular medications if he were outside the hospital because of his past history of stopping them when he could, and because he does not believe he needs them. However, they noted he often demands one particular medication, Ativan, which is given only sparingly because it is highly addictive.
When questioned in general about the "assaultive” incidents related by his doctors, the petitioner denied ever attacking anyone. However, when asked about the specific incidents, he admitted they had happened but differed over the details. He admitted being angry with and "pointing” at a social worker, but denied that such action was "threatening”. Regarding the pregnant nurse, petitioner said, "It was a different day. I tried to hit someone on Wednesday, not Friday. I tried to hit a nurse. I pushed * * * my hand went half way. I did not touch her. It was wrong. I was mad because he [sic] accused me of something I did not do.” Petitioner said he only meant to "scare” her.
When asked whether he banged his head or nose on the walls, petitioner answered by referring to the most recent incident and replied that he had banged his nose, not his head, on the occasion in question because he was angry at being placed in a straight jacket. He said "they” banged his head on the floor.
When petitioner was released from Creedmoor and living in an apartment with a roommate, he said the roommate beat him with a stick to get him to pay for his drugs. Petitioner said when he was found in traffic, he was only crossing the street; however, he claimed to have been hit by a car at the time, although that is not reflected in hospital records. He said he was not injured.
Referring to the doctor’s testimony regarding petitioner’s absence without leave from the hospital, petitioner testified that when he "ran away”, he "got mad and took crack”. He did so because he was "uptight” at not being on level six. He said he was "too upset to understand it was bad”.
Petitioner testified he did not believe his fall as a child had left him with any medical problems. He denied being mentally *553 ill and said he believes the medications he is taking are causing all of his problems. He said the Serentil makes his "mind twisted”; he had requested Ativan instead. He said he could get a Medicaid card, get his medications from a pharmacy and take them if he were living outside the institution. When asked what the medications do for him, he said they kept him "stable” and "calm”. Nevertheless, he did not believe he needs them and is "OK” without them.
The petitioner also testified that he could live with a friend who works in a diner, and get a check-cashing card to cash his Social Security Supplemental Security Income (SSI) benefits check. He admitted the friend had not come to see him in all the time he had been at Bronx Psychiatric Center. The friend was not present at trial.
The doctors and the petitioner did not disagree with one another on any material points. Although petitioner was anxious to be released and generally denied assaultive behavior or any other assertion by his doctors, when asked about particular incidents, admitted them although he disputed details. This evidence gave no support for the jury’s conclusion that petitioner, who admittedly had banged his nose on the floor and taken crack when he was angry, threatened others, including a pregnant woman, also when angry, and much of this while under supervision, does not need to be confined in a psychiatric institution. Petitioner testified he does not believe he needs to take medication, that he would be "OK” without it, and also admitted he had suspended medications on the only two occasions he had the opportunity to do so, and taken crack. Petitioner testified he was "unable to understand” that taking crack was wrong because he was angry. The salient fact here, from petitioner’s own testimony, is that petitioner gets angry a great deal and has a history of doing dangerous things to himself and others when angry. In addition, petitioner himself supported his psychiatrists’ testimony that his judgment was impaired to the extent he did not understand his need for care and treatment, in his denial of organic medical problems and in his explanation for taking crack.
His attorney argued that petitioner’s self-destructive behavior in the hospital was attributable to frustration at being in an institution. This ignored the fact that some of petitioner’s admitted self-destructive behavior took place on the only two occasions he had been outside the hospital setting, either in a partial release program or when he left the hospital without permission. Not getting one’s coffee at the *554 time one feels entitled to it, which was one occasion of frustration for the petitioner, is just as likely to happen outside an institution as inside it.
To believe that petitioner would have any minimal degree of safety outside the hospital setting, the jury would have had to believe that, once free, he would never again have occasion to get angry or frustrated, or that, outside the hospital setting he would somehow, on his own, develop a self-control that has eluded him until now. This is not a reasonable conclusion and there are no material facts in dispute which would justify granting a new trial. Nor is there evidence to support a belief that petitioner could survive safely in a less restrictive setting, when he still manages to injure himself in the most restrictive setting possible. There was no evidence, other than petitioner’s general promises regarding future behavior, to support the conclusion that he would not pose a danger to others. (See, Matter of Seltzer v Hogue, 187 AD2d 230, supra.)
The Director met his burden of showing that continued care and treatment in a psychiatric institution is essential to petitioner’s welfare. The evidence given by petitioner himself is not only materially consistent with the Director’s evidence, but in addition, supported fully the Director’s prima facie case that petitioner’s judgment is so impaired, he is unable to understand the need for continued care and treatment. Any evidence to the contrary is so meager as to be the equivalent of no evidence. (See, Westbrook v Green Bus Lines, 30 AD2d 959, supra.) Since this court could have directed judgment at the close of evidence, it is not necessary to bring this last issue before the jury again. (See, Du Bose v Velez, 63 Misc 2d 956 [Civ Ct, NY County 1970].)
This court holds that the evidence presented by the Director of Bronx Psychiatric Center was sufficient as a matter of law to show that continued care and treatment in a psychiatric institution is essential to Calvin Robinson’s welfare. In addition this court holds that the Director presented sufficient evidence as a matter of law to support a finding that petitioner’s judgment is so impaired that he is unable to understand the need for continued care and treatment.
Therefore, that portion of the jury’s verdict finding petitioner not in need of continued care and treatment in a psychiatric institution is set aside and judgment is entered in the affirmative regarding the question of whether the petitioner’s judg *555 ment is so impaired that he is unable to understand the need for continued care and treatment.
The original order for retention, dated November 29, 1995, will remain in force.