■ 390 West End Associates, Respondent, v Frederick B. Wildfoerster, III, Appellant. [661 NYS2d 202] —Order of the Appellate Term of the Supreme Court, First Department, (Parness, J. P., McCooe and Freedman, JJ.), entered May 24, 1996, which affirmed a judgment of the Civil Court, New York County (Howard Malatzky, J.), entered February 2, 1995, after a nonjury trial, awarding possession of the subject apartment to petitioner landlord, affirmed, without costs.

We agree with the majority at the Appellate Term and the trial court that there is essentially no evidence other than oral reflections of respondent and the deceased's friends that respondent's relationship with the deceased tenant of record was characterized by the "emotional and financial commitment and interdependence" necessary for purposes of family member succession to the rent stabilized tenancy.

Despite a 20 year relationship during which they lived together from 1976 to 1978 and again for more than two years prior to the tenant's death from AIDS in 1993, lacking are the normal indicia of a familial relationship. Although the tenant's

close friends testified, and the trial court found, that the tenant and respondent had a very close, loving relationship, the trial evidence failed to sufficiently establish respondent as a "family" member within the meaning of the applicable rent regulations.

The exact nature of respondent's living arrangements is unclear, given that he continued to receive his mail not at the deceased tenant's apartment but at 711 West End Avenue, listed that address on credit applications and used it on his driver's license and tax returns.

Moreover, although it is undisputed that respondent was totally dependent upon the tenant financially, there was no commingling of finances, no joint ownership of anything, not even an indication of sharing household or family expenses. Most significantly, there was no provision, financial or otherwise, made for respondent at a time when the tenant knew or should have known that he was dying.

The dissent suggests that the trial court and Appellate Term majority failed to consider the " 'totality of the relationship,' focusing instead on a single factor—the absence of a will—to conclude that respondent had failed to meet his burden under the statute". In fact, the trial court and the Appellate Term majority did analyze the various factors and did not focus solely on the absence of a will, finding that "[w]hile respondent claims to have been financially dependent on the tenant, the latter made no provision for the respondent *by will, insurance or otherwise*" (emphasis added).

While respondent argues that the reason there is little tangible proof of their interdependent relationship was because the deceased was an intensely private man who refused to publically acknowledge any personal relationship or even his impending death, the tenant in fact knew of his impending death and to that end asked respondent to assist him in recovering $150,000 in assets from Germany by means of a limited power of attorney. Nevertheless, the tenant made no transfers to respondent and the only "legacy" respondent obtained upon his death was a gift of $20,000 from decedent's estranged brother, a resident of California, who became administrator after the tenant unfortunately made no arrangements to have respondent or anyone else handle his estate, despite the fact that respondent lived with him for over two years prior to his death and cared for him during those difficult last months as a family member would.

Thus, respondent seeks to have the petitioner landlord and this Court do what the deceased tenant never did in any

fashion, which is acknowledge that their relationship could be described as having "family" attributes. What does emerge is a one-sided financial relationship. The respondent worked as the tenant's assistant in his business of producing cultural events but, while there was testimony that respondent and the tenant occasionally entertained and travelled together, the tenant never acknowledged any family-type relationship with the respondent. There is no picture, letter, note or other memento evincing a family-type relationship between the two and there were no other joint traditional "family-type" events or celebrations to evidence any interdependence in a familial sense. Concur—Nardelli, Williams and Andrias, JJ.

Milonas, J. P., dissents in a memorandum as follows: I agree with the conclusion of the dissent at the Appellate Term and would reverse. In my opinion, the evidence clearly establishes that respondent qualifies as a "family member" of the decedent, the tenant of record, such that respondent should be found to have acquired succession rights to the rent stabilized apartment the two had occupied together for two and one half years at the time of decedent's death.

Under the test first articulated in *Braschi v Stahl Assocs. Co.* (74 NY2d 201), and subsequently codified, as relevant to this matter, in various provisions of the rent stabilization regulations, the definition of a "family member" has been expanded beyond its traditional meaning to include "[a]ny other person residing with the tenant in the housing accommodation as a primary residence, who can prove emotional and financial commitment, and interdependence between such person and the tenant." (9 NYCRR 2500.2 [n] [2]; *see also,* 9 NYCRR 2520.6 [o] [2].) These regulations provide that evidence of whether such "commitment" and "interdependence" existed may include, but is not limited to, the following eight factors:

"(i) longevity of the relationship;

"(ii) sharing of or relying upon each other for payment of household or family expenses, and/or other common necessities of life;

"(iii) intermingling of finances as evidence by, among other things, joint ownership of bank accounts, personal and real property, credit cards, loan obligations, sharing a household budget for purposes of receiving government benefits, etc.;

"(iv) engaging in family-type activities by jointly attending family functions, holidays and celebrations, social and recreational activities, etc.;

"(v) formalizing of legal obligations, intentions, and responsi-

bilities to each other by such means as executing wills naming each other as executor and/or beneficiary, granting each other a power of attorney and/or conferring upon each other authority to make health care decisions each for the other, entering into a personal relationship contract, making a domestic partnership declaration, or serving as a representative payee for purposes of public benefits, etc.;

"(vi) holding themselves out as family members to other family members, friends, members of the community or religious institutions, or society in general, through their words or actions;

"(vii) regularly performing family functions, such as caring for each other or each other's extended family members, and/or relying upon each other for daily family services;

"(viii) engaging in any other pattern of behavior, agreement, or other action which evidences the intention of creating a long-term, emotionally committed relationship." (9 NYCRR 2500.2 [n] [2]; 9 NYCRR 2520.6 [o] [2].)

Notwithstanding this list, however, the regulations provide that "no single factor shall be solely determinative" in making such determination (9 NYCRR 2500.2 [n] [2]; 9 NYCRR 2520.6 [o] [2]). This principle was also expressed in *Braschi*, which cautioned that although the enumerated factors are "most helpful," "it should be emphasized that the presence or absence of one or more of them is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis, control." (*Braschi v Stahl Assocs. Co.*, *supra*, 74 NY2d, at 213.)

In the instant case, the decedent, a producer of cultural events, first met respondent through a mutual friend (one of the witnesses, in fact) in 1970. Respondent became decedent's business assistant in 1974, and the two lived together from 1976 to 1978. They remained in contact after they separated, and, in the late 1980's, they resumed their working relationship. They also resumed their personal relationship; respondent ultimately moved back into the subject apartment in January 1991, where he lived with the decedent until the latter's death in July 1993.

They worked out of the apartment, with respondent performing the function of an assistant and personal secretary. They travelled together, attended business and social functions together, entertained together and visited and were visited by friends as a couple. According to one of the doormen at the building, respondent's parents visited him there on several occasions. The decedent paid all household expenses and provided

complete financial support for respondent; he also paid certain of respondent's debts, and respondent had access to his bank card. From the time decedent first showed signs of being ill and was diagnosed with an AIDS-related lung illness in the fall of 1991, until the time of his death, respondent alone cared for him and made all necessary provisions for him. Shortly before his death, he gave respondent a power of attorney by which respondent, pursuant to decedent's direction, transferred financial assets in Germany back to decedent's account in the United States. Although he died without having made a will, and his estate therefore went to his estranged brother who lived in California, the brother allowed respondent to keep $20,000 out of the $150,000 of estate funds.

In my opinion, this evidence, measured against the listed factors and, under *Braschi (supra,* at 213), evaluated in the context of the "totality of the relationship," demonstrates the "dedication, caring and self-sacrifice" necessary to satisfy respondent's burden under the statute.

The trial court, however, erred in failing to consider the "totality of the relationship," focusing instead on a single factor—the absence of a will—to conclude that respondent had failed to meet his burden under the statute. The trial court explicitly found that all the witnesses had been truthful and credible and was "sure" that the two men had shared a "very close loving relationship." Nevertheless, the court found it "inconceivable" that such an "accomplished," "successful" and "intelligent" man would die intestate (allowing his possessions to pass to an estranged sibling), without having made a will in respondent's favor, given respondent's financial dependence upon him. Thus, despite the testimony of all the witnesses that decedent had taken pains to keep his homosexuality a secret and that he could not acknowledge his impending death—or even the nature of his illness—the court determined that the lack of such financial planning, regardless of "how private a person" decedent had been, was fatal to respondent's claim.

Given the "totality of the relationship" as described by all the witnesses, I find the absence of a will insufficient to defeat respondent's claim. Indeed, it is entirely consistent with the portrait provided of the decedent by these witnesses, who knew him intimately over a period of many years and had spent substantial amounts of time with him and respondent, as an intensely private individual, and one who would not acknowledge the seriousness of his condition. In fact, one witness, a close friend for over thirty years to whom decedent had declared his love for respondent, expressed reluctance to

discuss the intimate nature of the relationship even at trial, given how "reserved" and secretive decedent had been about this aspect of his life. Each of the three friends who testified, however, unequivocally viewed respondent and decedent as a family unit or couple. That decedent did not publicly reveal the nature of the relationship, and that respondent honored decedent's wishes in this respect even after his death (by describing himself only as a "personal assistant" in the obituary submitted to the New York Times), should not be grounds to invalidate the rest of the evidence, all of which illustrates a relationship sufficient to meet the statutory standard (*see, e.g., Lerad Realty Co. v Reynolds*, NYLJ, Aug. 29, 1990, at 22, col 5 [Civ Ct, NY County]). Similarly, that respondent continued to receive mail at his former address after moving in with decedent is consistent with the latter's insistence on presenting a facade to the outside world.

The majority at the Appellate Term erred also in effectively substituting its own findings of fact for the trial court's explicit finding that a "very close loving relationship" had existed between the two men. The majority refers only to the existence of some "personal relationship" in addition to a business relationship and points not only to the lack of formalized legal obligations (such as a will), but also to its conclusion that respondent and decedent had not shared household expenses, intermingled finances, or held themselves out as a family unit to their families, close friends or the public. As noted, however, the uncontradicted testimony, which the trial court found credible, showed that, at least with respect to their closest friends, decedent and respondent had indeed behaved as a family. Moreover, the fact that decedent paid all household expenses, instead of the two having "shared" such expenses, is of no moment. In this respect, their relationship may be said to mirror a so-called "traditional" marriage, where one spouse pays all expenses while the other provides "domestic support." Such support is "of no less value in a homosexual household than it would be in a heterosexual one" (*Arnie Realty Corp. v Torres*, NYLJ, Oct. 5, 1995, at 27, col 3 [Civ Ct, Bronx County]). Indeed, two witnesses described the relationship in just such traditional "husband" and "wife" terms.

Finally, the depth of respondent's commitment and the significance of the relationship is movingly evidenced by the caring and support that respondent alone provided as decedent slowly declined in health. This period sadly and tellingly underscores their emotional commitment to each other and their interdependence.

Accordingly, under the regulatory guidelines as well as those of *Braschi (supra)*, the order of the Appellate Term, affirming the judgment of the Civil Court, should be reversed and possession of the subject apartment awarded to respondent.