OPINION OF THE COURT
Arthur F. Engoron, J.
The instant motion is granted to the extent that the clerk is hereby directed to enter judgment in favor of respondent and against petitioner dismissing the instant licensee holdover proceeding with prejudice.
Background
The basic facts are not significantly subject to dispute. Petitioner landlord Fort Washington Holdings, LLC owns the building at and known as 690 Fort Washington Avenue, New York, New York 10040. Respondent occupant Maurice Abbott has lived there continuously, in apartment 3N, since 1979. His aunt, Alice Murad, the tenant of record, lived there from July 1, 1967 until her death on May 9, 2008.
Respondent had a difficult childhood. Born in 1962, he was hyperactive and, typically, threw property out his apartment window. His mother (described by a nephew as “an adult with a child’s mind”) screamed at him, and he screamed back. His father hit him with a belt and tied him with rope. His grandfather once hit him with a metal poker. The police were called. Respondent was taken to Elmhurst Hospital. Later, he spent a month at the Payne Whitney Clinic. He was sent to an out-of-state military boarding school for approximately 5th through 8th grades.
By 1979, when he was 17 and living in Rego Park, Queens, respondent was on the verge of being sent to a “group home.” Across town, in Washington Heights, Manhattan, Alice was a double “empty-nester”; her husband, Albert, had died in 1971 and her children, all grown, had moved out. In a last-ditch effort to avoid his further institutionalization, Alice took her nephew in.
The relationship was an instant and durable success, and from then on they lived as mother and son. From the quotidian *366 (shopping at Macy’s, Saks, Altman’s; watching television, with respondent’s head on Alice’s shoulder and holding hands), to the joyous (trips to Radio City Music Hall and Atlantic City; holidays, including Mother’s Day, celebrated together), to the spiritual (worshiping in synagogue, observing holidays at home), to the legal (respondent was Alice’s Social Security “representative payee”), respondent and Alice went through life as a team. Period photographs show aunt and nephew celebrating holidays and special occasions together.
They lived modestly. Respondent contributed to their coexistence, paying for, at various times and to various degrees, their joint expenses for food; electricity (for which they were jointly named and liable); cable television; apartment repairs; and transportation. Respondent paid, at least in part, for Alice’s cosmetics and health care costs. When, for six months, respondent received public assistance, his shelter payments went to Alice. Respondent cleaned (the floors, the windows) and cooked. He purchased a Maltese, Jessica, for Alice. When Alice became old and ill, he administered her medicine, crushing pills into pudding, and schlepped her to doctor appointments. During her final hospitalization, respondent visited her every day. He sobbed at her death and spoke at her funeral and unveiling.
Respondent may have been like a son to Alice, but he was not like a spouse. Alice paid all of the rent, some $500 a month. She did not include respondent in her will, which she executed in 1973, six years prior to respondent moving in, and simply never changed it. Alice retired in 1989, when she was earning some $15,000 annually, from the hosiery store she owned; and when she died her only assets were some jewelry.
Shortly after Alice’s death petitioner commenced the instant licensee holdover proceeding. Respondent claims succession rights as a “non-traditional family member” {infra). After significant disclosure, the case was presented to the jury on November 17 and 18, 2009. On the morning of November 19, the court ruled, as requested by petitioner, and over respondent’s objection, that the verdict sheet would include separate questions as to whether respondent and Alice had an “emotional commitment and interdependence” and as to whether they had a “financial commitment and interdependence.” Petitioner conceded that the subject apartment was respondent’s primary residence.
The jury verdict sheet asked the following three questions:
“1. Did Alice Murad and Maurice Abbott live in the *367 apartment located at 690 Fort Washington Avenue, Apartment No. 3N, as their primary residence for two years before Alice Murad passed away in May, 2008?
“2. Did Maurice Abbott and Alice Murad have an emotional commitment and interdependence?
“3. Did Maurice Abbott and Alice Murad have a financial commitment and interdependence?”
The jury answered “yes” to the first two questions and “no” to the third question.
The Law
Both sides agree that 9 NYCRR 2204.6 (d) (3) (i) (which has various counterparts in other regulations) governs the instant proceeding. Pursuant thereto, petitioner may not evict respondent if he was residing with Alice and
“can prove emotional and financial commitment, and interdependence between [himself and Alice]. Although no single factor shall be solely determinative, evidence which is to be considered in determining whether such emotional and financial commitment and interdependence existed, may include, without limitation, such factors as listed below. In no event would evidence of a sexual relationship between such persons be required or considered.
“(a) longevity of the relationship;
“(6) sharing of or relying upon each other for payment of household or family expenses, and/or other common necessities of life;
“(c) intermingling of finances as evidenced by, among other things, joint ownership of bank accounts, personal and real property, credit cards, loan obligations, sharing a household budget for purposes of receiving government benefits, etc.;
“(d) engaging in family-type activities by jointly attending family functions, holidays and celebrations, social and recreational activities, etc.;
“(e) formalizing of legal obligations, intentions, and responsibilities to each other by such means as executing wills naming each other as executor and/or beneficiary, conferring upon each other a power of attorney and/or authority to make health care decisions each for the other, entering into a personal relationship contract, making a domestic partnership declaration, or serving as a representative payee for *368 purposes of public benefits, etc.;
“(f) holding themselves out as family members to other family members, friends, members of the community or religious institutions, or society in general, through their words or actions;
“(g) regularly performing family functions, such as caring for each other or each other’s extended family members, and/or relying upon each other for daily family services;
“(h) engaging in any other pattern of behavior, agreement, or other action which evidences the intention of creating a long-term, emotionally committed relationship . . . .”
These factors are essentially a codification of the leading case of Braschi v Stahl Assoc. Co. (74 NY2d 201, 211-213 [1989]), which, albeit in a different context, held that
“the term family, as used in 9 NYCRR 2204.6 (d), should not be rigidly restricted to those people who have formalized their relationship by obtaining, for instance, a marriage certificate or an adoption order. The intended protection against sudden eviction should not rest on fictitious legal distinctions or genetic history, but instead should find its foundation in the reality of family life. In the context of eviction, a more realistic, and certainly equally valid, view of a family includes two adult lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence. This view comports both with our society’s traditional concept of ‘family’ and with the expectations of individuals who live in such nuclear units . . .
“The determination as to whether an individual is entitled to noneviction protection should be based upon an objective examination of the relationship of the parties. In making this assessment, the lower courts of this State have looked to a number of factors, including the exclusivity and longevity of the relationship, the level of emotional and financial commitment, the manner in which the parties have conducted their everyday lives and held themselves out to society, and the reliance placed upon one another for daily family services (see, e.g., Athineos v Thayer, NYLJ, Mar. 25, 1987, at 14, col 4 [Civ Ct, Kings County], affd NYLJ, Feb. 9, 1988, at 15, col 4 *369 [App Term, 2d Dept] [orphan never formally adopted but lived in family home for 34 years]; 2-4 Realty Assoc. v Pittman, 137 Misc 2d 898, 902 [two men living in a ‘father-son’ relationship for 25 years] . . .). These factors are most helpful, although it should be emphasized that the presence or absence of one or more of them is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis, control.”
The Trial
The trial was completely one-sided in the three ways that mattered. First, respondent himself testified at length, and he called several witnesses; petitioner called none. This observation is no criticism of petitioner’s counsel, who, like respondent’s counsel, conducted himself professionally in all respects, argued vigorously and skillfully, and made the most of the case he had. As there simply was no evidence of, say, other residences, or secret bank accounts, or public bickering, there simply were no witnesses to call. Nevertheless, all witnesses — respondent; his cousin Jack (Alice’s son); two health professionals; and a friend of respondent — supported respondent’s position.
Second, having presided over trials (jury and nonjury) for some seven years, this court believes it has some insight into the indicia of truth telling. All of respondent’s witnesses presented as truthful and guileless. They testified clearly and consistently (and, for all that appeared, credibly). Indeed respondent and Jack testified not just as if motivated to tell the truth, but as if deathly afraid to lie. As respondent’s counsel points out, the jury considered respondent credible enough to find in his favor on the “emotional” issue. The jury finding on the “financial” issue seems more a question of how it interpreted and applied the law than any doubt about respondent’s and his witnesses’ truthfulness.
Third, and most importantly, the evidence in the case demonstrated amply and unequivocally that respondent and Alice so completely intertwined their personal lives that they were the functional equivalent of parent and child (a close parent and child, at that). In ceaseless tandem, they lived together, they played together, and they worked together (around the house, and, for a time, at the hosiery store, where respondent helped out). In the early years, he depended on her, and she protected and, in family feuds, defended, him. In later years, she depended *370 on him, and, in health care decisions, he advocated for her. They lived in harmony and symbiosis.
Discussion
CPLR 4404 (a), “[mjotion after trial where jury required,” provides, in relevant part, as follows:
“After a trial of a cause of action or issue triable of right by a jury, upon the motion of any party or on its own initiative, the court may set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence [or] in the interest of justice . . . .”
Every trial judge realizes that juries are the bedrock of Anglo-American justice, and second-guessing them is a drastic measure to be exercised sparingly and only in extreme instances. This case is such an instance. (See generally Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978] [directing a verdict requires, essentially, a finding that “there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial”]; Nicastro v Park, 113 AD2d 129, 132 [2d Dept 1985] [“whether a jury verdict is against the weight of the evidence is essentially a discretionary and factual determination which is to be distinguished from the question of whether a jury verdict, as a matter of law, is supported by sufficient evidence”].) Of course, “[i]n deciding if the jury conclusion was utterly irrational, the evidence must be viewed in the light most favorable to the nonmoving party [here, petitioner], who must be accorded every favorable inference which can reasonably be drawn.” (Barker v Bice, 87 AD2d 908, 908 [3d Dept 1982].)
In Matter of Robinson v Sanchez (168 Misc 2d 546, 547-548 [Sup Ct, Bronx County 1996]), Judge Lucindo Suarez summarized this area of the law as follows:
“Setting aside a verdict because it is contrary to the weight of the evidence is done either because the evidence supports only one conclusion, the jury finding to the contrary, or because the evidence supports more than one conclusion but overwhelmingly favors the conclusion rejected by the jury. In the former, the court enters judgment in favor of the party entitled to judgment as a matter of law. In the lat *371 ter, the court orders a new trial.”
Less technically, but perhaps more in accord with common human experience, if the judge is convinced that the nonprevailing party should have won, she should order a new trial; if she is positive that the nonprevailing party should have won, she should direct a verdict.
The instant verdict must be overturned for two independent reasons. First, upon research and reflection, the verdict sheet should have presented a unitary question as to whether respondent and Alice had “emotional and financial commitment and interdependence.” (9 NYCRR 2204.6 [d] [3] [i].) No case has addressed this point directly (but see Bims Realty Corp. v Durham, NYLJ, Sept. 18, 1997, at 30, col 2 [App Term, 2d Dept]). However, several reasons strongly militate in favor of a unitary, not bifurcated, question. Perhaps most importantly, the regulation does not say, as it easily could have: both an emotional and financial commitment and interdependence. It does not say: an emotional commitment and interdependence and a financial commitment and interdependence. Either formulation would require a different result in today’s decision. Furthermore, the language at issue uses the word “and” twice: “emotional and financial commitment and interdependence.” (Emphasis added.) Despite the second “and,” the drafters obviously did not intend to require occupants to prove “commitment” and, separately, “interdependence.” Rather, “commitment” and “interdependence” are “of a piece.” The first “and,” linking “emotional” and “financial,” should be interpreted the same way, as a joinder, not a severance. Moreover, the phrase at issue must be interpreted in the light of the Court of Appeals’ seminal decision in Braschi (74 NY2d at 213): “the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties . . . should, in the final analysis, control.” If the “totality” controls, then the “emotional” and the “financial” cannot be torn asunder; and there could hardly be more “dedication, caring, and self-sacrifice” than here. Also, the drafters listed eight criteria, without assigning or designating any of them as either “emotional” or “financial.” True, some of them are more relevant in one realm than the other, but that just highlights the fact that the regulation does not say “evidence which may be considered in determining whether such emotional commitment and interdependence existed, may include” and “evidence which is to be considered in determining whether such financial commitment and interdependence existed, may *372 include.” Rather, it simply says, “evidence which is to be considered in determining whether such emotional and financial commitment and interdependence existed, may include, without limitation, such factors as listed below.” (9 NYCRR 2204.6 [d] [3] [i].)
Also, emotions and finances often run together and are often difficult, if not impossible, to isolate. If I am rich and treat my 10-year-old nephew to an expensive afternoon at Yankee Stadium, have I demonstrated emotional commitment and interdependence, financial commitment and interdependence, or both. If I am poor and take him to the local park to play baseball for free, are we any less committed and interdependent, any less of a family unit? Should he not be able to succeed to my rent-regulated apartment because of my limited financial means?
The instant verdict must also be overturned because the evidence adduced at trial, all of it, supported only one conclusion: that respondent and Alice had a loving, family-like relationship, characterized by emotional and financial commitment and interdependence. As described at some length above, respondent and Alice loved and cared for each other, and they each contributed to the household what money and labor they could. Had respondent had more funds, and/or if Alice had had more needs, doubtless respondent would have contributed more, and what he contributed would have been more documented. Maurice and Alice led touchingly simple lives. The little they had was “ours,” not “mine.” A lack of funds is not, should not, and cannot, be the basis to deny a finding of “family” status.
A close, item-by-item examination of the eight criteria is not necessary here. Suffice it to say the respondent absolutely satisfied criteria (a), (d), (/), ig), and (h); strongly satisfied criterion (b); and somewhat satisfied criteria (c) and (e). These latter two were satisfied to the extent that respondent’s and Alice’s lives allowed.
Thus respondent is entitled to a directed verdict in his favor. (See generally Annunziata v Colasanti, 126 AD2d 75, 81 [1st Dept 1987, Sullivan, J.] [“Having correctly set aside the verdict in favor of defendants, the trial court should have taken the additional step of directing judgment in plaintiffs favor on the issue of liability”].)
If this court were not directing a verdict for respondent, it would order a new trial, on the ground that the verdict was against the weight of the evidence, for the reasons noted above, *373 or in the interests of justice, on the ground that the verdict sheet erroneously bifurcated “emotional and financial commitment and interdependence.” (See generally Matter of Robinson v Sanchez, 168 Misc 2d 546, 547 [1996] [“Setting aside a verdict in the interest of justice is usually done for reasons such as errors in admissibility of evidence, mistakes in the charge, misconduct, newly discovered evidence and surprise, or change in the law after submission of the case to the jury. The Trial Judge must decide whether substantial justice has been done, which includes a determination as to whether it is likely the verdict has been affected”].)
In opposition to the instant motion, petitioner points to the kinds of stumbles and small errors inherent in any two days of trial testimony by nonexperts. There is also the matter of the family (cousin Jack, not respondent) submitting (apparently on orders of Alice) a false “SCRIE” (Senior Citizen Rent Increase Exemption) application (claiming that Alice lived alone). But its main point, understandably, appears to be that respondent failed to prove “financial interdependence.” (Opp aff H1Í 6, 11, 16, 17; but see 1ÍH 22, 23, 32, 34 [“financial commitment and interdependence”].) As noted above, respondent was not required to prove “financial interdependence,” or even “financial commitment and interdependence.”
Petitioner understandably relies on Bims Realty Corp. v Durham (NYLJ, Sept. 18, 1997, at 30, col 2), in which the court reversed a finding that a cousin of the deceased tenant of record satisfied the same criteria applicable here. The Bims decision had two prongs: (1) that the statute requires “both an emotional and financial commitment and interdependence”; and (2) that the evidence in that case “clearly established the absence of the requisite financial commitment and interdependence inasmuch as there was no sharing of financial resources and no financial interdependence between the [cousins].” (Id. at 30, col 3.) Thus Bims rests on the faulty premise of two separate requirements (note its use of the word “both,” which does not exist in the regulations). Bims also noted that the tenant and the occupant “did not have any joint bank accounts or credit cards, that they did not own any property jointly, that they were not financially dependent on each other and that her money was hers and his money was his.” (Id. at 30, col 2.) Here, respondent moved into his aunt’s apartment when he was a troubled, presumably impecunious 17-year-old student; it would be fair to say that “her money was theirs,” and he depended upon her until he, *374 like her, was scraping out a modest living. Neither of them owned any real property; they briefly had a joint bank account (the account was soon closed, not switched to one or the other of them). That they each paid for their own separate telephone line hardly proves that they were not like family towards each other.
The other cases petitioner cites are decidedly less on point. In GSL Enters., Inc. v Goldstein (NYLJ, July 13, 1993, at 22, col 2 [App Term, 1st Dept]), the tenant of record and the occupant were not related, lived together for only a couple of years, and their relationship ended on a sour note (the instant relationship lasted 30 years and ended with sobbing and grief at a funeral). In the short 54 Featherco v Correa (251 AD2d 23 [1st Dept 1998]), the court was unswayed by testimony, uncorroborated by documentary evidence, of a 10-year relationship between two women who shared activities and expenses and held themselves out as “a couple.” And in 390 W. End Assoc. v Wildfoerster (241 AD2d 402 [1997]), the tenant of record and the occupant lived together for only four years during a 20-year relationship; and even during those years the occupant used a different address to receive mail, to apply for credit cards, and for his driver’s license and tax returns. Such a second residence would have been inconceivable in the instant case.
As argued by respondent, cases decided after the year 2000 (infra) seem to have a different cast than those decided prior thereto (supra). RHM Estates v Hampshire (18 AD3d 326 [1st Dept 2005]) is strikingly similar to the instant case on its facts (albeit starkly different in its procedural posture).
“The evidence presented to the trial court amply supported its conclusion that respondent’s relationship with the now deceased tenant of record, Ms. Baer, was that of a nontraditional family member, as defined in Rent Stabilization Code (9 NYCRR) § 2520.6 (o) (2). Respondent lived with Baer for 15 years without paying rent; the two shared holiday and birthday celebrations, traveled together and traditionally ate their breakfast together in the subject apartment. Also, they took care of each other, as needed. It is of note that respondent spent substantial time caring for Baer throughout a lengthy battle with cancer, which eventually took her life. Further, respondent used the apartment’s address on a W-2 form, a bank statement and a voter registration form. He also received his mail there. *375 There is no evidence that he had any other address. While the statute considers intermingling of finances, the absence of this factor here does not negate the conclusion that Baer and respondent had a family-like relationship (see Rent Stabilization Code [9 NYCRR] § 2520.6 (o) (2) [‘no single factor shall be solely determinative’]).” (Id. at 326-327 [emphasis added].)
Substitute “Alice” for “Ms. Baer,” “30” years for “15,” “old age” for “cancer” and add the aunt-nephew relationship, and you have the instant case to a T. (See also Arnie Realty Corp. v Torres, 294 AD2d 193, 193-194 [1st Dept 2002] [“Contrary to petitioner’s appellate argument, the absence of documentary evidence of financial interdependence did not undermine respondent’s claim to succession rights where the totality of the testimonial evidence . . . established that respondent and the deceased had had a long-term relationship characterized by emotional and financial commitment and interdependence (see, Braschi v Stahl Assoc. Co., 74 NY2d 201, 211)”]; see also Roberts Ave. Assoc. v Sullivan, 2003 NY Slip Op 51091[U], *3 [App Term, 1st Dept 2003] [“The absence of documentary evidence of intermingling of finances does not undermine respondent’s claim where the parties had limited assets, and where other criteria for succession are present”], citing Arnie.)
In the final analysis, as stated by respondent’s counsel (reply aff 1i 3), “Alice Murad and Maurice Abbott loved each other as mother and son, and they lived together as such for thirty years.” The evidence showed no less, and, under the circumstances, could have shown no more. (The court is happy to note in passing that respondent’s relationship with his parents improved in later years.)
Conclusion
For the reasons stated herein, the clerk is hereby directed to enter judgment in favor of respondent and against petitioner dismissing the instant proceeding with prejudice.