In the Matter of CHARLOTTE SELTZER, as Chief Executive Officer of Creedmoor Psychiatric Center, Appellant, v LARRY HOGUE, Respondent. (Proceeding No. 1.)

In the Matter of LARRY HOGUE, Respondent. CHARLOTTE SELTZER, Appellant. (Proceeding No. 2.)

Second Department, March 1, 1993

### APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General,* New York City *(Arnold D. Fleischer* and *Yolanda M. Pizarro* of counsel), for appellant.

*Gerald W. Kaplan,* Mineola *(Dennis B. Feld* of counsel; *Kim L. Darrow* and *Thomas Behrendt* with him on the brief), for respondent.

### OPINION OF THE COURT

Per Curiam.

The main question to be resolved on these appeals is whether the appellant, the Chief Executive Officer of Creedmoor Psychiatric Center, met her burden of demonstrating, by clear and convincing evidence, that the respondent Larry Hogue is mentally ill and in need of continued care and treatment, and that he poses a substantial threat of physical harm to himself or others, thereby justifying his retention at Creedmoor Psychiatric Center.

### I

The respondent, Larry Hogue, was admitted to Creedmoor Psychiatric Center (hereinafter Creedmoor), on December 14, 1992, pursuant to Mental Hygiene Law § 9.27, upon the application of the Commissioner of the New York City Department of Mental Health, Mental Retardation and Alcoholism Services, which was supported by the certificates of two examin-

ing physicians from Bellevue Hospital Forensic Psychiatry Services. Hogue had been at Bellevue Hospital pursuant to court order for an evaluation of his competency to stand trial on a misdemeanor charge arising out of an incident in Manhattan in which Hogue allegedly had scraped paint from a car.

In their examining certificates, doctors Robert H. Berger and Henry C. Weinstein from Bellevue concurred that Hogue was suffering from an organic brain disorder which was the result of a head injury he had sustained in the military. Dr. Berger noted that significant frontal lobe damage was present. Both doctors concurred that Hogue suffered from schizophrenia, residual type, and chronic substance abuse. The doctors noted that Hogue denied any mental illness or substance abuse, lacked insight into his illness or the impact of substance abuse on his behavior, thinking, and impulse control, and did not feel the need for any treatment. Dr. Berger further noted that Hogue had a history of prior psychiatric hospitalizations as well as a history of several criminal arrests involving threatening and destructive behavior. Dr. Weinstein observed that Hogue's past history indicated that he immediately stopped compliance with any treatment recommendations and began substance abuse upon his release from psychiatric hospitals. Finally, both doctors were of the opinion that Hogue would immediately deteriorate after his discharge and that, if discharged, he would be a danger to others.

On January 21, 1993, Hogue, through his counsel, Mental Hygiene Legal Service, requested a court hearing, pursuant to Mental Hygiene Law § 9.31, to contest his need for involuntary care and treatment. On the same date, the appellant made an application, pursuant to Mental Hygiene Law § 9.33, for an order authorizing retention of Hogue at Creedmoor for a period not to exceed six months.

## II

The two proceedings were thereafter heard together before the Supreme Court, Queens County, at which time, the appellant presented two witnesses, Lisa Lehr, a resident of West 96th Street in Manhattan, and Dr. Kusum Kathpalia, a staff psychiatrist at Creedmoor.

Lehr testified that she came in contact with Hogue for the first time in February 1985. At that time, Hogue appeared to be merely a harmless homeless man to whom she used to

bring food and clothing. However, over the years Hogue's behavior turned violent and erratic. Specifically, Lehr observed Hogue on numerous occasions jumping into moving traffic from crouched positions between cars. She also observed Hogue siphoning gasoline out of parked cars at 2:00 or 3:00 A.M., igniting newspapers with the gasoline, and then stuffing the newspapers into other cars, and assaulting and injuring an old woman. Lehr further testified that on one occasion Hogue carried a marble bench weighing approximately 150 pounds from a building adjacent to her own, and crashed it with "great fury" through the window of her car, bending the frame and breaking the steering wheel. Hogue also frequently exposed himself in the middle of the street and masturbated. Finally, Lehr testified that at another, earlier hearing involving Hogue, he had threatened her by saying: "You're dead, bitch". On cross-examination, Lehr conceded that she knew nothing about Hogue's present behavior at Creedmoor.

Dr. Kusum Kathpalia testified that she was Hogue's treating physician at Creedmoor and first examined him on December 15, 1992. At that time, she diagnosed Hogue as suffering from (1) psycho-polysubstance abuse, involving the use of crack cocaine, heroin, LSD, PCP, marihuana and alcohol, (2) organic affective syndrome, and (3) bipolar affective disorder syndrome-manic, which was in partial remission. In addition to her examination, Dr. Kathpalia relied on Hogue's available history contained in medical records from Manhattan Psychiatric Center and Rockland Psychiatric Center, as well as information from Hogue himself. Medical records from Manhattan and Rockland Psychiatric Centers, as well as records from Creedmoor, were introduced into evidence, and were referred to by Dr. Kathpalia throughout her testimony.

Dr. Kathpalia testified that Hogue was first admitted to a hospital for psychiatric treatment in 1963 and had multiple admissions at both Manhattan and Rockland Psychiatric Centers stemming from numerous misdemeanor charges and incidents of disorderly and dangerous conduct in the community. Hogue's erratic behavior over the years included urinating and exposing himself in the street, walking and jumping on subway tracks, and verbally threatening passersby in the street. Hogue had smashed cars, thrown garbage, ripped mirrors off of cars, broken store fronts, and attempted to strangle people on the street. Once he also had been arrested for setting a fire at Metropolitan Hospital. Each time that Hogue was admitted to a psychiatric hospital, he was agitated and

sometimes experienced paranoid delusions and auditory hallucinations. Dr. Kathpalia testified that after each admission to a psychiatric hospital Hogue's condition would improve within a month, after which he would be discharged with the understanding that he would seek follow-up care as an outpatient. However, Hogue's records revealed that he never followed up with treatment, and within periods ranging from 72 hours to 3 weeks after discharge, he would be readmitted to a psychiatric hospital.

Dr. Kathpalia testified that when she examined Hogue upon his admission to Creedmoor, he was irritable and argumentative. He was "very difficult" and "challenging". It was Dr. Kathpalia's opinion that Hogue's drug abuse and involvement with the criminal justice system were the result of his underlying mental disorder and his historical pattern of noncompliance with any treatment regimen once he was released.

Dr. Kathpalia testified that in the past, medications such as Lithium or Thorazine had been administered to Hogue to treat his mental illness, and that these medications, when taken, improved his condition. However, she also testified that when Hogue stopped taking these medications, his mental condition deteriorated and he became dangerous. Although Hogue had been essentially cooperative on his ward and had not exhibited any dangerous behavior since his admission to Creedmoor, Dr. Kathpalia added that he maintained a grandiose attitude and talked with an inflated sense of self-esteem. Hogue seemed to have a fixed delusion that he was a Vietnam veteran, and continued to deny his mental illness or his need for treatment. Indeed, he lacked any insight into the fact that his behavior outside the hospital was improper.

With respect to his drug use, Hogue had begun to acknowledge his abuse of drugs and to attend group therapy sessions for drug counseling. However, Hogue still did not appreciate that his abuse of drugs was connected with his behavior in the community and his mental illness. Accordingly, Hogue had been unwilling to participate in a program at Creedmoor that was designed to treat mentally ill patients who are chemical abusers.

Dr. Kathpalia explained that Hogue's bipolar affective disorder was in partial remission because he was presently in the structured setting of a hospital, where his access to drugs and alcohol had been eliminated. However, she again emphasized that he had a substantial history of deterioration once re-

leased from a structured environment and that he continued to deny his mental illness.

Dr. Kathpalia testified that Hogue's improvement while in Creedmoor only related to his external behavior, since Tegretol was being administered to him to treat his seizure disorder and this medication had the secondary effect of stabilizing his moods. However, Hogue had refused to take any of the other medications that had been prescribed to treat his mental illness. It was Dr. Kathpalia's opinion that Hogue's underlying mental condition had not improved since his admission to Creedmoor.

Dr. Kathpalia opined, based on a reasonable degree of psychiatric certainty, that (1) Hogue was afflicted with mental illness to such a degree that he required involuntary care and treatment, (2) he was not suitable for any type of outpatient care or treatment, and (3) if he were released, he would not comply with any treatment regimen, his mental condition would deteriorate, and he would be a danger to himself and others.

In support of his application for release, Hogue's counsel presented five witnesses. Shawn Sells, Hogue's son, and Geraldine Sells, Hogue's ex-wife, testified that they lived in Bridgeport, Connecticut, in a two-family house, and were willing to take Hogue home with them to live. Both indicated that if Hogue did live with them they would insure that he would receive appropriate treatment for his mental illness and would take any necessary medications. Mr. Sells also testified that he had an excellent relationship with his father and that his father had actually lived with him in 1991 for a period of about "eight months [to] a year". During this period, Hogue had not, to the witnesses's knowledge, been violent towards others, did not try to hurt himself, and did not act in a bizarre or unusual fashion.

Ernest Crane, Hogue's Intensive Care Manager from Visiting Nurse Services of New York, testified that he had visited Hogue at Creedmoor at least once a week. During that period, Hogue never became violent or assaultive. Crane also testified that he had visited the Sells' home and found that it would be a suitable place for Hogue to live since the Sells could provide care, proper treatment, and supervision. Crane said that he investigated psychiatric centers and programs in the Bridgeport area and found an outpatient program convenient to the Sells house which would be appropriate for Hogue's care and

treatment. However, Crane conceded that those in charge of the outpatient program had not yet agreed to treat Hogue, but claimed that he was currently trying to arrange an interview between them and Hogue so that treatment could begin.

Thelma Green, Hogue's social worker, testified that she also visited the Sells' home and found that it was adequate for Hogue's needs, since Hogue would have his own bedroom. In her interviews with both Shawn and Geraldine Sells, she found them to be warm, caring, and supportive of Hogue. In addition, Green confirmed Crane's testimony that there was an outpatient treatment program appropriate for Hogue in the Bridgeport area.

Finally, Hogue testified in his own behalf and indicated that if he were discharged, he would live with his son for a couple of years, after which he would go to Georgia where he would buy a house. Hogue also said that he would listen to his son, take all necessary medication, and obey any recommended treatment regimen.

On cross-examination, Hogue admitted that he had been in mental institutions before and that he had mental illness in the past. This illness manifested itself in flashbacks relating to Agent Orange and napalm gas to which he was allegedly exposed in military service. However, when questioned in detail about his military service, Hogue repeatedly stated: "I forgot".

With respect to Lehr's testimony, Hogue characterized it as "propaganda" and "bull", but did admit that he smashed her car with a bench and had been in jail before. On several occasions during his testimony at the hearing, Hogue denied that he was currently mentally ill or dangerous to society. Hogue complained during his hearing testimony that (1) the petitioner's attorney was using people to lie about him, (2) the Judge had already made up his mind about the matter, and (3) he was being held at Creedmoor as a political prisoner because he was a member of the Black Panther Party. Hogue admitted that he had suffered a head injury, and stated: "When I get out of here give me some marijuana and a bottle of liquor".

At the conclusion of the hearing, the Supreme Court found that Hogue was not mentally ill and was not a danger to himself or society. The Supreme Court was of the view that Hogue merely had a "defensive" attitude, and that Hogue's family was willing to take him to Connecticut and care for

him. In two separate orders, both dated February 2, 1993, the Supreme Court denied the appellant's retention application, and granted Hogue's application for release.

## III

It is well settled that civil commitment constitutes a significant deprivation of liberty which requires due process protection *(see, Addington v Texas,* 441 US 418, 425; *Humphrey v Cady,* 405 US 504, 509). Accordingly, the United States Supreme Court has held that "clear and convincing evidence" is required by the Due Process Clause of the 14th Amendment in order to involuntarily commit an individual to a mental hospital in a proceeding brought under State law *(Addington v Texas, supra,* at 425). The courts of this State have required that in order for a hospital to retain a patient for involuntary psychiatric care, it must establish, by clear and convincing evidence, that the patient is mentally ill and in need of continued care and treatment, and that he poses a substantial threat of physical harm to himself or others *(see, Matter of Jeannette S.,* 157 AD2d 783; *Matter of Edward L.,* 137 AD2d 818; *Matter of Carl C.,* 126 AD2d 640; *Matter of Harry M.,* 96 AD2d 201).

It is true that the findings of fact of a hearing or trial court are generally not to be disturbed on appeal unless such findings could not have been reached under any fair interpretation of the evidence *(see, Matter of Boggs v New York City Health & Hosps. Corp.,* 132 AD2d 340). However, the Court of Appeals has unanimously held that the authority of the Appellate Division, "is as broad as that of [a] trial court * * * and * * * it may render the judgment it finds warranted by the facts" *(Northern Westchester Professional Park Assocs. v Town of Bedford,* 60 NY2d 492, 499). In the instant case, we are compelled to make our own findings of fact because there is simply no fair interpretation of the evidence that can support the Supreme Court's determination that Hogue is not mentally ill and does not present a danger to himself or others.

The unrebutted evidence adduced from Dr. Kathpalia's expert psychiatric testimony, Hogue's medical records, and the personal observations of Lisa Lehr, depicts an individual who is presently suffering from mental illness and who has had a long history of mental illness and dangerous behavior dating back almost 30 years. This evidence also indicates that al-

though Hogue's external behavior has improved somewhat in Creedmoor (a structured setting in which he takes certain seizure medication), he has a history of noncompliance with any treatment program upon his release from psychiatric hospitals. Indeed, once he is released from these institutions, his mental illness invariably deteriorates to the point that he engages in substance abuse and activities which are dangerous to himself and others. Hogue did not offer any probative evidence at the hearing to impeach these findings and observations. Thus, we find that Hogue is in need of involuntary care and treatment and should be retained by Creedmoor (see, Matter of Jeannette S., supra; Matter of Boggs v New York City Health & Hosps. Corp., supra).

## IV

Finally, Hogue argues that even if the criteria for his continued retention in a psychiatric hospital have been met, he nevertheless should be transferred to the care and custody of his son and ex-wife in Connecticut, pursuant to Mental Hygiene Law § 9.31 (c). We disagree.

Mental Hygiene Law § 9.31 (c) provides as follows: "If it appears, however, that the relatives of the patient or a committee of his person are *willing and able* properly to care for him at some place other than a hospital, then, upon their written consent, the court may order the transfer of the patient to the care and custody of such relatives or such committee" (emphasis added).

Although there was evidence adduced at the hearing that Hogue's son and ex-wife were *willing* to care for him in Connecticut, and would execute a writing to that effect, the record does not support a finding that they would be *able* to properly care for him, as the statute requires. Hogue's hospital records reveal that he was admitted to Manhattan Psychiatric Center numerous times during roughly the same period in 1991 that Mr. Sells claimed Hogue had lived with him. In view of this crucial fact, and Hogue's historic refusal of treatment outside of a hospital setting, there is simply no assurance that if Hogue were to live with his son and ex-wife, they would be able to prevent a deterioration of his condition or restrain his conduct.

Accordingly, the appellant's application for retention is granted, and the respondent's application for release denied.

MANGANO, P. J., THOMPSON, SULLIVAN and O'BRIEN, JJ., concur.

Ordered that the orders dated February 2, 1993, are reversed, on the facts, without costs or disbursements, the appellant's application to involuntarily retain the respondent is granted, and the respondent's application for release is denied.