*903 OPINION OF THE COURT
David Goldstein, J.
This application was brought pursuant to Mental Hygiene Law § 9.33, for an order permitting Creedmoor Psychiatric Center to continue involuntary hospital care and treatment for up to an additional one-year period. In doing so, the hospital claims that the patient continues to suffer from a mental illness which renders necessary further care and treatment and, as a result of such illness, she would pose a substantial threat of harm to herself were she to be released and could not safely survive in the community. An accompanying application to administer medication involuntarily was withdrawn during the hearing, on consent, it appearing that necessary medication was being taken voluntarily.
The record, in material respects, is undisputed as to the operative facts. Yvette S. is a 43-year-old, single, African American woman, originally from Jamaica, West Indies, who is now homeless — a resident of the Jamaica Women’s Shelter. She was admitted to Creedmocr on October 19, 1993, from the Queens Hospital Center, having been escorted there by the police, who found her sleeping on the steps of the Shelter for two to three days. She claimed she had been locked out of her room and was forced to remain on the steps for that period of time.
The record reflects that Ms. S. has a history of hospital admissions, dating back to December 1987, when she was admitted to Pilgrim State Hospital, after being picked up by police for preaching in the streets. It is claimed that she was religiously preoccupied and wandering and preaching in traffic, clearly at risk to herself. The record before me reflects that, following her discharge, she was readmitted to Pilgrim Psychiatric in 1988, again for "exhibiting disruptive behavior, singing and walking in the middle of the traffic.”
On her present admission, she initially refused any medication and rejected any plan for placement anywhere, except back at the Jamaica Women’s Shelter. She was preoccupied with religion and spent all of her time holding a Bible, praying and singing gospel. She insisted that she be returned to the Shelter so she could "carry on her mission given by God” — to preach in the streets. Dr. Leopold Frost was of the view that Ms. S. was psychotic and her judgment impaired. His report states that she has remained in complete isolation, insisting that she be returned to the Shelter. She is obsessed *904 with preaching in the streets as part of her mission from God. She testified to having heard God’s voice about seven years ago and that she was told to go to the Shelter to preach. Dr. Frost concluded that she was delusional and suffered from a schizoaffective disorder, bipolar type. Both he and the court-appointed psychiatrist, Dr. Hugh Butts, agreed that, in the absence of proper medication and treatment, Ms. S. could not care or provide for herself and that long-term hospital care was necessary for clinical improvement and stabilization.
Dr. Butts, the court-appointed psychiatrist, was of the view that Ms. S. could benefit from psychotherapy, with a partial relaxed hospital program, but only if she cooperated in terms of medication and treatment. At the present time, however, she is unwilling to do so. He found she had no real insight into her condition and, since she could not provide for herself in terms of food, clothing, or shelter, she would be a danger to herself if released, albeit not to others. He reached this conclusion in part based upon her past history and conduct when not in a structured hospital setting. He felt her condition would deteriorate as a result of the refusal to take needed medication and she would return to the streets to preach. He was also of the view that the only sound course of action, beneficial to her health and well-being, was to retain her until she accepted the nature of her condition and was willing to cooperate in terms of medication and treatment.
The issue in this proceeding is somewhat akin to that which confronted the Appellate Divisions in Matter of Seltzer v Hogue (187 AD2d 230) and Matter of Francis S. (206 AD2d 4). In those cases, the question was whether a patient could be retained in a psychiatric hospital setting where, in the past, his release resulted in a deterioration of the condition and a resumption of violent behavior, thus posing a danger to others. In our case, the issue is somewhat different and, in that respect, novel, in that, in the past, any deterioration in Ms. S.’s condition resulted in her acting in a dangerous manner in terms of her own safety, not others.
In Matter of Seltzer v Hogue (supra), the proof at the hearing disclosed that respondent was suffering from an organic brain disorder resulting from a head injury which occurred in the military. He suffered from schizophrenia, residual type, and chronic substance abuse. He had a history of prior psychiatric hospitalizations and several criminal arrests for threatening and destructive behavior. His past history reflected that, upon release from any psychiatric hospital, *905 he stopped compliance with any recommended treatment program and began substance abuse. The doctors opined that, based upon his conduct in the past, respondent would immediately deteriorate upon discharge and that he would be a danger to others. The Appellate Division, Second Department, unanimously held that there was clear and convincing evidence that the patient was mentally ill, in need of continued care and treatment and posed a substantial threat of physical harm to others if released. In doing so, it cited his "history of noncompliance with any treatment program” upon release from any psychiatric hospital (187 AD2d, at 238, supra): "Indeed, once he is released from these institutions, his mental illness invariably deteriorates to the point that he engages in substance abuse and activities which are dangerous to himself and others. Hogue did not offer any probative evidence at the hearing to impeach these findings and observations. Thus, we find that Hogue is in need of involuntary care and treatment and should be retained by Creedmoor (see, Matter of Jeannette S., supra [157 AD2d 783]; Matter of Boggs v New York City Health & Hosps. Corp., supra [132 AD2d 340]).”
Similarly, in Matter of Francis S. (supra), the Appellate Division, First Department, found that there was sufficient evidence that S., who had been acquitted on criminal charges by reason of mental disease or defect, suffered from a dangerous mental disorder and was in need of care and treatment in a secure facility. The proof reflected that the patient suffered from a mental illness but, as long as he did not use drugs or alcohol, he was not dangerous. In the past, upon release from a hospital setting, S. discontinued compliance with any treatment plan and would relapse into drug and alcohol abuse. Based upon the psychiatric opinion that, once released, he would revert to a prior pattern of behavior, which included alcohol and drug abuse, noncompliance with a medically approved treatment program, and violent behavior, he was found "suffering from a dangerous mental disorder” and would "inevitably resort to assaultive or other dangerous behavior upon his release from a controlled environment.” (206 AD2d, at 20, supra.) Upon that basis, the petition for recommitment, pursuant to CPL 330.20 (14), should have been granted, with S. confined to a secure psychiatric institution.
In our case, the situation is somewhat different in that there is no claim here that Ms. S. would pose a danger or threat to others. Rather, it is argued that, from her past conduct, if released, she would discontinue any treatment and *906 revert to a course of conduct and pattern of behavior hazardous to her own safety.
The operative legal standard is clear. In order to retain a patient for involuntary psychiatric care, the hospital must establish by clear and convincing evidence "that the patient is mentally ill and in need of further care and treatment, and that the patient poses a substantial threat of physical harm to herself or to others” (Matter of Jeannette S., 157 AD2d, at 783, supra; see also, Matter of Seltzer v Hogue, 187 AD2d, at 237, supra; Matter of Edward L., 137 AD2d 818, 819; Matter of Carl C, 126 AD2d 640; Matter of Harry M., 96 AD2d 201, 208). While the threat can result from a refusal, failure or inability to meet essential needs for food, clothing or shelter (Matter of Carl C, supra; Matter of Harry M., 96 AD2d, at 208, supra), it is not enough to merely demonstrate that particular care or treatment is necessary or would be beneficial. As was observed by Associate Justice (now Associate Judge) Titone in Matter of Harry M. (96 AD2d, at 206, supra): "if an individual can live safely in freedom and is not dangerous to himself or others, due process will not tolerate his involuntary commitment irrespective of whether treatment some may deem beneficial will be provided * * * Moreover, the danger must be a substantial threat to his physical well-being to justify commitment”.
The reported decisions where commitment or retention was directed all relate to situations where the patient’s failure or refusal to adhere to prescribed care or treatment would be hazardous to others (see, Matter of Francis S., supra; Matter of Seltzer v Hogue, supra; Matter of Jeannette S., supra). In this respect the within proceeding is unique in that here, it is argued that the release of the patient would be dangerous to herself, not to others.
Ms. S. is neither assaultive nor violent, although Dr. Butts expressed the view that she could be suicidal. Her religious fixation, propelled by her self-imposed mission from God to preach at and around the Shelter, coupled with the fact that, in the past, she discontinued any care or treatment immediately upon her discharge, plainly establishes the danger which her mental condition poses for her own safety.
Nor is there any dispute that she cannot or will not provide for herself in terms of food, clothing or shelter. As she herself testified, her only "mission” is to live at the Shelter and to preach. In terms of providing for herself, she claimed she *907 would rely solely upon what others might give her. This is hardly a plan for the future.
Under the circumstances, taking into account that, on prior occasions, when she was released, she immediately reverted to her disruptive pattern, walking, singing and preaching in the middle of traffic, while, at the same time discontinuing any prescribed care or treatment, the record convincingly supports the unanimous psychiatric opinion that the patient cannot provide for herself in terms of food, clothing or shelter. Thus, her release poses a real and substantial danger of physical harm to herself. Inasmuch as she is now voluntarily submitting to prescribed medication, it is hoped and anticipated that her condition will improve. At the present time, however, and on this record, sufficient evidence has been shown to direct that she be retained in a secure psychiatric setting.
Accordingly, the application by the hospital, pursuant to Mental Hygiene Law § 9.33, to continue involuntary care and treatment is granted only to the extent that Creedmoor Psychiatric Center is authorized to retain the patient for further psychiatric care and treatment for a period not exceeding six months.