OPINION OF THE COURT
Anthony J. Cutrona, J.
These cases represent the first constitutional challenge to the assisted outpatient treatment provisions of Mental Hygiene Law § 9.60, commonly referred to as Kendra’s Law.
Respondents contend that contrary to the provisions of Mental Hygiene Law § 9.60, the Due Process Clause of the New York Constitution, the common law of New York State and the Equal Protection Clauses of the New York and United States Constitutions mandate that in order for a court to grant a petition for assisted outpatient treatment, it must find by clear and convincing evidence that respondent lacks the capacity to make a reasoned treatment decision regarding the proposed treatment plan.
The Statute
In 1999, the New York State Legislature amended the Mental Hygiene Law to provide for court-ordered assisted outpatient treatment for some persons with mental illness. In enacting Kendra’s Law[1] the Legislature found that:
“there are mentally ill persons who are capable of living in the community with the help of family, friends and mental *838 health professionals, but who, without routine care and treatment, may relapse and become violent or suicidal, or require hospitalization. The legislature further finds that there are mentally ill persons who can function well and safely in the community with supervision and treatment, but who without such assistance, will relapse and require long periods of hospitalization.
“The legislature further finds that some mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis. Family members and caregivers often must stand by helplessly and watch their loved ones and patients decompensate. Effective mechanisms for accomplishing these ends include: the establishment of assisted outpatient treatment as a mode of treatment; improved coordination of care for mentally ill persons living in the community; the expansion of the use of conditional release in psychiatric hospitals; and the improved dissemination of information between and among mental health providers and general hospital emergency rooms.” (L 1999, ch 408, § 1, reproduced in McKinney’s Cons Laws of NY, Book 34, following Mental Hygiene Law § 9.60, 2000 Pocket Part, at 31-32.)
Kendra’s Law was enacted by the Legislature to address these issues.
Mental Hygiene Law § 9.60 (a) (1) defines assisted outpatient treatment: “(1) ‘assisted outpatient treatment’ shall mean categories of outpatient services which have been ordered by the court pursuant to this section. Such treatment shall include case management services or assertive community treatment team services to provide care coordination, and may also include any of the following categories of services: medication; periodic blood tests or urinalysis to determine compliance with prescribed medications; individual or group therapy; day or partial day programming activities; educational and vocational training or activities; alcohol or substance abuse treatment and counseling and periodic tests for the presence of alcohol or illegal drugs for persons with a history of alcohol or substance abuse; supervision of living arrangements; and any other services within a local or unified services plan developed pursuant to article forty-one of this chapter, prescribed to treat the person’s mental illness and to assist the person in living and functioning in the community, or to attempt to prevent a relapse or deterioration that may reasonably be predicted to result in suicide or the need for hospitalization.”
*839 In order to obtain an assisted outpatient treatment order pursuant to Kendra’s Law, the petitioner must prove at a court hearing, by clear and convincing evidence, that the patient meets each of the criteria enumerated in Mental Hygiene Law § 9.60 (c). These criteria are, inter alia, that:
“(1) the patient is eighteen years of age or older; and
“(2) the patient is suffering from a mental illness; and
“(3) the patient is unlikely to survive safely in the community without supervision, based on a clinical determination; and
“(4) the patient has a history of lack of compliance with treatment for mental illness that has:
“(i) at least twice within the last thirty-six months been a significant factor in necessitating hospitalization in a hospital, or receipt of services in a forensic or other mental health unit of a correctional facility or a local correctional facility, not including any period during which the person was hospitalized or incarcerated immediately preceding the filing of the petition or;
“(ii) resulted in one or more acts of serious violent behavior toward self or others or threats of, or attempts at, serious physical harm to self or others within the last forty-eight months, not including any period in which the person was hospitalized or incarcerated immediately preceding the filing of the petition; and
“(5) the patient is, as a result of his or her mental illness, unlikely to voluntarily participate in the recommended treatment pursuant to the treatment plan; and
“(6) in view of the patient’s treatment history and current behavior, the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to the patient or others as defined in section 9.01 of this article; and
“(7) it is likely that the patient will benefit from assisted outpatient- treatment.” (Mental Hygiene Law § 9.60 [c].)
At the hearing, the physician must testify and explain the patient’s proposed treatment plan and the rationale of each category of treatment proposed. (Mental Hygiene Law § 9.60 [i] [1].)
If the physician recommends that medication be included, he must provide additional information and testify about “the types or classes of medication recommended, the beneficial and detrimental physical and mental effects of such medication, and whether such medication should be self-administered or *840 administered by an authorized professional.” (Mental Hygiene Law § 9.60 [i] [2].) Furthermore, if the physician recommends blood or urine screening for illegal substances, he must testify about the patient’s history of substance abuse and relate that history to the possibility of relapse or deterioration. (Mental Hygiene Law § 9.60 [i] [1].)
Finally, the physician must testify, and the court must find by clear and convincing evidence, that assisted outpatient treatment is the least restrictive alternative for the patient. (Mental Hygiene Law § 9.60 [h] [4].)
Discussion
Due Process
Respondents rely primarily on the case of Rivers v Katz (67 NY2d 485 [1986]), in support of their argument that Kendra’s Law violates the Due Process Clause of the New York Constitution in that it does not require a finding of incapacity before a court can order a patient to follow a course of medical treatment.
Rivers (supra) addressed the issue of under what circumstances a hospital may administer antipsychotic medication to an involuntarily committed mental patient against his or her will.
In analyzing this issue, the Court in Rivers held that “It is a firmly established principle of the common law of New York that every individual ‘of adult years and sound mind has a right to determine what shall be done with his own body’ * * * and to control the course of his own medical treatment.” (Id., at 492, quoting Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129 [1914].) Generally,
“a patient’s right to determine the course of his medical treatment was paramount to what might otherwise be the doctor’s obligation to provide medical care, and that the right of a competent adult to refuse medical treatment must be honored, even though the recommended treatment may be beneficial or even necessary to preserve the patient’s life [citation omitted]. This fundamental common-law right is coextensive with the patient’s liberty interest protected by the due process clause of our State Constitution [citation omitted].
“In our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding his medical treatment in order to insure that the *841 greatest possible protection is accorded his autonomy and freedom from unwanted interference with the furtherance of bis own desires [citations omitted]. This right extends equally to mentally ill persons who are not to be treated as persons of lesser status or dignity because of their illness [citation omitted].” (Rivers v Katz, supra, at 493.)
The Court of Appeals held, however, that while the patient has a fundamental right to refuse medical treatment, this right is “not absolute and under certain circumstances may have to yield to compelling State interests [citations omitted].” (Id., at 495.) A hospital can medicate a patient over objection when it is a proper exercise of the State’s police power or parens patriae power. (Id.)
When exercising its parens patriae power to “[provide] care to its citizens who are unable to care for themselves because of mental illness [citations omitted] * * * ‘the individual himself must be incapable of making a competent decision concerning treatment on his own. Otherwise, the very justification for the state’s purported exercise of its parens patriae power — its citizen’s inability to care for himself * * * would be missing. Therefore, the sine qua non for the state’s use of its parens patriae power as justification for the forceful administration of mind-affecting drugs is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs’ [citations omitted]. Such a determination is uniquely a judicial, not a medical function [citations omitted].” (Id., at 496.)
With regard to the police power, “[w]here the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution, the State may be warranted, in the exercise of its police power, in administering antipsychotic medication over the patient’s objections [citations omitted].” (Id., at 495.)
It is respondents’ position that because a court order which directs an individual to comply with a government-created assisted outpatient treatment plan interferes with that individual’s fundamental right to make his own medical decisions, the due process requirements articulated by the Court of Appeals in Rivers v Katz (supra) must be followed. It is further argued that far from being remedial in nature, the statute contemplates the summary arrest and 72-hour detention of a noncom-pliant individual on the mere suspicion that he may be in need of involuntary admission to the hospital. Respondents state that this is enormous incursion into the individual’s liberty in *842 that the patient can be detained summarily without a further hearing or psychiatric examination.
Petitioners, on the other hand, argue that Kendra’s Law does not abridge a patient’s fundamental right to make his own treatment decisions since there is no forcible administration of medication and the patient will suffer no punitive measures for failing to comply with the treatment plan. Petitioners further claim that the purpose of the statute is remedial, not punitive, and that a patient’s failure to comply with the court-ordered treatment plan results only in heightened scrutiny by a physician to ensure that the patient receives treatment.
This court agrees with petitioners’ counsel that a Kendra’s Law order does not unconstitutionally violate the patient’s fundamental right to choose the course of his own medical treatment.
The Court in Rivers (supra) held that an involuntarily committed psychiatric patient could not be forcibly medicated against his or her will absent a judicial determination that the patient lacked the mental capacity to make treatment decisions.
In contrast to the issues presented in Rivers hearings, Kendra’s Law contemplates treatment of patients who have been discharged from the hospital. These patients do not require the forcible administration of medication.
The statute provides that the physician who is advocating for an assisted outpatient treatment plan must provide the patient, his treating physician, and upon the patient’s request, “an individual significant to the patient,” with an “opportunity to actively participate in the development of such plan.” (Mental Hygiene Law § 9.60 [i] [1].) It follows, that if the hearing court is not satisfied that the patient and/or his representative was given a meaningful opportunity to participate in the development of the written treatment plan, the plan will not be approved.
Clearly, the Legislature has anticipated that a patient going though this process has the capacity to participate and make decisions about the course of his or her treatment.[2] In contrast to a situation where a patient who lacks capacity to make his *843 or her own decisions regarding medical treatment must be forced to take medication against his or her will, Kendra’s Law envisions a process where a patient with capacity actively participates in the planning of his or her treatment plan. The object of Kendra’s Law is to ensure that these patients retain their capacity, do not relapse or deteriorate, and do not become a danger to themselves or others.
This court rejects respondents’ argument that an assisted outpatient treatment order, while not providing for the forcible administration of medication, unreasonably violates the patient’s right to refuse medication by threatening arrest upon noncompliance with the plan.
Mental Hygiene Law § 9.60 (n) provides the remedy for a patient’s failure to comply with a court-ordered assisted outpatient plan. “Where in the clinical judgment of a physician, the patient has failed or has refused to comply with the treatment ordered by the court, and in the physician’s clinical judgment, efforts were made to solicit compliance, and, in the clinical judgment of such physician, such patient may be in need of involuntary admission to a hospital pursuant to section 9.27 of this article, or for whom immediate observation, care and treatment may be necessary pursuant to section 9.39 or 9.40 of this article, such physician may request the director, the director’s designee, or persons designated pursuant to section 9.37 of this article, to direct the removal of such patient to an appropriate hospital for an examination to determine if such person has a mental illness for which hospitalization is necessary pursuant to section 9.27, 9.39 or 9.40 of this article. Furthermore, if such assisted outpatient refuses to take medications as required by the court order, or he or she refuses to take, or fails a blood test, urinalysis, or alcohol or drug test as required by the court order, such physician may consider such refusal or failure when determining whether the assisted outpatient is in need of an examination to determine whether he or she has a mental illness for which hospitalization is necessary * * * Such person may be retained for observation, care and treatment and further examination in the hospital for up to seventy-two hours to permit a physician to determine whether such person has a mental illness and is in need of involuntary care and treatment in a hospital pursuant to the *844 provisions of this article. Any continued involuntary retention in such hospital beyond the initial seventy-two hour period shall be in accordance with the provisions of this article relating to the involuntary admission and retention of a person. If at any time during the seventy-two hour period the person is determined not to meet the involuntary admission and retention provisions of this article, and does not agree to stay in the hospital as a voluntary or informal patient, he or she must be released. Failure to comply with an order of assisted outpatient treatment shall not be grounds for involuntary civil commitment or a finding of contempt of court.”
The Mental Hygiene Law provides that a person is in need of involuntary care and treatment in a hospital if the “person has a mental illness for which care and treatment as a patient in a hospital is essential to such person’s welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment.” (Mental Hygiene Law § 9.01.) “The inability to understand the need for care and treatment essential to that person’s welfare has been repeatedly held to encompass a finding that the patient poses a substantial threat of physical harm to self or others.” (Matter of Maimonides Med. Ctr., 173 Misc 2d 111, 118 [Sup Ct, Kings County 1997], citing O’Connor v Donaldson, 422 US 563; Matter of Harry M., 96 AD2d 201 [2d Dept 1983]; Matter of Jeannette S., 157 AD2d 783 [2d Dept 1990]; Matter of Edward L., 137 AD2d 818 [2d Dept 1988].)
As previously stated, the court does not agree with respondents’ argument that a failure to take medication results in the summary arrest of the patient. Rather, the patient’s failure to comply with the treatment plan, whose formulation the patient had the opportunity to participate in, leads to the heightened scrutiny of physicians for a 72-hour evaluation period, but only after a physician has determined that the patient may be in need of involuntary admission to a hospital. This 72-hour evaluation period is a reasonable response to a patient’s failure to comply with treatment when it is balanced against the compelling State interests which are involved. (See, Project Release v Prevost, 722 F2d 960, 977 [2d Cir 1983].)
In order to obtain a Kendra’s Law order, a petitioner must first show, by clear and convincing evidence, that the patient has a history of noncompliance with treatment that has led to at least two hospitalizations or one or more acts of serious violent behavior or threats of, or attempts at, serious physical harm. (Mental Hygiene Law § 9.60 [c] [4].) The petitioner must *845 also show that the patient is not likely to voluntarily comply with treatment in the absence of a Kendra’s Law order. (Mental Hygiene Law § 9.60 [c] [5].) Furthermore, the petitioner must prove, by clear and convincing evidence, that in view of this history, “the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to the patient or others” (Mental Hygiene Law § 9.60 [c] [6] [emphasis added]). Finally, the petitioner must show that assisted outpatient treatment is the least restrictive alternative for the patient (Mental Hygiene Law § 9.60 [j] [2]), suggesting that without it the patient will have to remain hospitalized or, if he is in the community, he may need to be rehospitalized.
In sum, the court has already made a judicial determination, based on clear and convincing evidence, that once the patient fails to comply with the treatment plan she is likely to become dangerous to herself or others. As previously stated, “the state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.” (Addington v Texas, 441 US 418, 426 [1979].)
These statutory provisions are significant in that they are in accord with recent court decisions in which physicians were permitted to consider a patient’s conduct in the community, including a history of relapses or deterioration, in deciding if a patient is dangerous.
In Matter of Seltzer v Hogue (187 AD2d 230 [2d Dept 1993]) the Second Department was presented with a civil committee whose behavior improved in the hospital, yet who, upon discharge, would not comply with treatment and quickly deteriorated into substance abuse and dangerousness. (Id., at 238.) The Court found that physicians could take into account the patient’s behavior in the community, after discharge, in making a determination of dangerousness. (Id., at 238.) The Court authorized retention of the patient, pursuant to Mental Hygiene Law § 9.33, holding that (at 237-238), “The unrebutted evidence adduced from Dr. Kathpalia’s expert psychiatric testimony, Hogue’s medical records, and the personal observation's of Lisa Lehr, depicts an individual who is presently suffering from mental illness and who has had a long history of mental illness and dangerous behavior dating back almost 30 years. This evidence also indicates that although Hogue’s *846 external behavior has improved somewhat in Creedmoor (a structured setting in which he takes certain seizure medication), he has a history of noncompliance with any treatment program upon his release from psychiatric hospitals. Indeed, once he is released from these institutions, his mental illness invariably deteriorates to the point that he engages in substance abuse and activities which are dangerous to himself and others.”
Likewise, in the context of an insanity acquittee, the First Department found that the defendant’s rejection of treatment and decompensation in the community could be considered in determining whether he should be recommitted to a secure psychiatric facility. (Matter of Francis S., 206 AD2d 4, 19 [1st Dept 1994], affd 87 NY2d 554 [1995].) As in Hogue (supra), the defendant was not dangerous in the structured environment of a hospital, but upon discharge, he did not comply with treatment and decompensated to the point of dangerousness. (Id., at 19-20.) The First Department found that his physicians should have been permitted to take his behavior in the community into account in evaluating his dangerousness. (Id., at 20.) The Court of Appeals affirmed, noting that the Appellate Division’s finding of current dangerousness “comports with the evidence in the record.” (Matter of Francis S., 87 NY2d 554, 561.)
These precedents are significant because they allowed physicians to consider a patient’s conduct in the community, including a history of relapses or deterioration, in deciding dangerousness. Kendra’s Law takes guidance from these decisions in providing that the patient’s failure to take medication, coupled with his or her history of decompensation, can lead to a finding that the patient is likely to be dangerous. Kendra’s Law is a means by which patients who have such a history can be discharged to the community with the supervision and assistance they need to avoid decompensation and rehospitalization.
It should be noted that there is precedent in the Mental Hygiene Law for a patient to be evaluated by physicians for 72 hours without any finding of dangerousness by a court or even a physician. Pursuant to Mental Hygiene Law § 9.13 (b), “[i]f a voluntarily committed patient gives written notice to the hospital director of his desire to leave, he must be ‘promptly’ released from the hospital * * * unless the director determines that ‘there are reasonable grounds for belief that the patient may be in need of involuntary care and treatment.’ * * * In *847 that case, the patient may be retained for up to seventy-two hours of the patient’s written notice * * * During the seventy-two hour period, the director must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention.” (Project Release v Prevost, supra, at 966 [2d Cir 1983].) The requirement that the director have reasonable grounds for belief that the patient may be in need of involuntary care and treatment is very similar to the requirement in Mental Hygiene Law § 9.60 (n) that a patient may be brought to the hospital for evaluation if, in the clinical judgment of a physician, the patient may be in need of involuntary admission to a hospital.
In Project Release v Prevost (722 F2d 960, supra), the court upheld the constitutionality of New York’s voluntary, involuntary, and emergency commitment procedures contained in sections 9.13, 9.27, 9.37 and 9.39 of the Mental Hygiene Law. The court held that “ ‘the layers of professional [and judicial] review’ contained in the New York State Mental Hygiene Law’s elaborate notice and hearing provisions * * * [meet] procedural due process minima [citations omitted].” (Id., at 975.)
In the recent case of Charles W. v Maul (214 F3d 350 [2d Cir 2000]) the court specifically noted the determination in Project Release (supra) that the 72-hour evaluation period of Mental Hygiene Law § 9.13 was constitutional in finding that plaintiffs due process rights were not violated because the State’s legitimate interests justified confining criminal defendants found incompetent to stand trial for a 72-hour evaluation period in order to determine whether they met the standards for civil commitment under the Mental Hygiene Law. The court held that “[i]f anything, the state’s interests in brief administrative confinement are stronger in the present case, where the charges against the incompetent defendant evidence his possible dangerousness.” (Charles W. v Maul, supra, at 359.) Similarly, a patient who is subject to an assisted outpatient treatment order has been adjudicated, upon clear and convincing evidence, a danger to self or others when failing to comply with treatment. Given this likelihood of dangerousness to self or others, it is this court’s determination that the 72-hour evaluation period is a reasonable countermeasure under both the State’s parens patriae and police powers. As stated in Mental Hygiene Law § 9.60 (n), a patient who is determined to be in need of involuntary admission to the hospital would be *848 protected by all of the procedural safeguards already contained within the Mental Hygiene Law.[3]
Equal Protection
The Equal Protection Clause (US Const, 14th Amend, § 1) provides that no State shall “deny to any person within its jurisdiction the equal protection of the laws.” (US Const 5th, 14th Amends.) In other words, equal protection mandates that “all persons similarly situated should be treated alike.” (City of Cleburne v Cleburne Living Ctr., 473 US 432, 439 [1985].) The Equal Protection Clause of the New York Constitution provides substantially the same rights. (See, Alevy v Downstate Med. Ctr., 39 NY2d 326 [1976].)
In Cleburne, the Court held that “[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.” (473 US, supra, at 440.) This standard of review does not apply, however, in cases involving fundamental rights or a suspect class. (See, Heller v Doe, 509 US 312, 318-319 [1993].) In such cases State action is “subjected to strict scrutiny and will be sustained only if [it is] suitably tailored to serve a compelling state interest.” (City of Cleburne v Cleburne Living Ctr., 473 US, at 440.) A third, mid-tier level of review, commonly referred to as heightened scrutiny, is applied where the individual interest involved is not fundamental in nature but is considered “important.” (Board of Educ. v Nyquist, 83 AD2d 217 [2d Dept 1981].)
The respondents argue that the Legislature of this State has created three classes of individuals who may be stripped of their fundamental right to control the course of their own medical treatment, to wit, individuals subject to guardianship proceedings pursuant to Mental Hygiene Law article 81 (commonly referred to as alleged incapacitated persons or AIP’s), involuntary psychiatric inpatients and psychiatric outpatients such as respondents. It is further argued that in order for either an AIP or an involuntary psychiatric patient to be stripped of this fundamental right there must be a finding by clear and convincing evidence that the individual is not capable of making his own treatment decisions. (See, Mental Hygiene Law art 81; Rivers v Katz, supra.) In the case of psychiatric outpatients such as respondents, however, no such finding is required by *849 the statute. Counsel concludes, that because such disparate treatment is not supported by any State interest, compelling or otherwise, the instant applications should be denied as a violation of respondents’ right to equal protection of the laws.
As previously stated by this court, persons subject to assisted outpatient treatment orders are not unconstitutionally deprived of their fundamental right to refuse medical treatment. There is no punitive remedy available to a petitioner for a patient who fails to comply with the written treatment plan, only a constitutionally acceptable procedure to ensure that the patient is evaluated by a physician.
Assuming, arguendo, that the abridgment of the patient’s fundamental right to refuse medical treatment was involved, an equal protection analysis would lead to the conclusion that the different treatment for assisted outpatient subjects as opposed to AIP’s and involuntarily committed psychiatric patients is warranted.
Unlike the other two categories of patients, the subjects of an assisted outpatient treatment order are persons who live in the community and have a history of dangerousness to self or others which has been satisfactorily demonstrated to the court upon clear and convincing evidence. Furthermore, it has been demonstrated that they are likely to decompensate and become dangerous again if they fail to follow their treatment plans. Clearly, the State has a compelling interest in taking measures to prevent these patients who pose such a high risk from becoming a danger to the community and themselves. Kendra’s Law provides the means by which society does not have to sit idly by and watch the cycle of decompensation, dangerousness and hospitalization continually repeat itself. Moreover, as previously discussed, Kendra’s Law is narrowly tailored to achieve these goals within the framework of the involuntary and emergency commitment procedures of the Mental Hygiene Law.
In conclusion, for all of the foregoing reasons, respondents’ motion for a declaration that Mental Hygiene Law § 9.60 is unconstitutional absent a requirement that a respondent lacks the capacity to make a reasoned treatment decision, before an assisted outpatient treatment order can be granted, is denied.

. Mental Hygiene Law § 9.60 was given the name “Kendra’s Law” for Kendra Webdale, who was pushed to her death in front of a moving subway train on January 3, 1999 by Andrew Goldstein, a person with a long psychiatric history.

. In this court’s experience presiding over hearings pursuant to Mental Hygiene Law § 9.60 it has become clear that many of the subject patients, especially those that are still in the hospital and are to be imminently discharged, have the capacity to make treatment decisions. These are *843 patients who have been taking their medication in the hospital and have stabilized. The practical result of requiring a lack of capacity component to be added to the statutory scheme would be to eliminate the option of an assisted outpatient treatment order for many patients.

. Even if a patient is eventually retained in the hospital after the 72-hour evaluation period, he or she still cannot be forcibly medicated absent a judicial determination of incapacity or under emergency circumstances. (See, Rivers v Katz, 67 NY2d 485, supra.)